There are two appeals. I'm not sure which the court would prefer. Why don't we hear the contract? There's a contract damages issue. Yeah, I understand. We understand what the issues are. I think I think it's Galaxy goes first. Do I press a timer here or does that automatically? You know, there are 20 minutes per side. I understand that. We're taking both cases so you can sort of... Okay. We have the cases well in mind so you can not be too worried about whether you're on cross appeal or otherwise. Okay. My name is Mark Crawford. I represent Galaxy Publishing and Paul Arato. We are the defendants in the case and also the cross complainants. As you know, Galaxy and Arato had acquired or Arato had acquired in 1975 rights, motion picture and television rights to the comic book character Sheena, Queen of the Jungle. And they brought that concept eventually to Columbia Pictures to make a motion picture television show and entering into various contracts with them, assigning them those rights in exchange, getting the right to produce the motion picture and here the main issue in this case, the right of first negotiation with Columbia to produce any subsequent television show. And that's really why we're here today is that second right. Could you sort of help me and probably all of us sort out what your theory is here of damages? Because your complaint pleads a variety of theories, but the debate that has come before us has centered a lot on the Copeland case. The Copeland case talks about expectation versus reliance, but you've also pled concepts of unjust enrichment and rescission. And what I'm trying to understand is where you think in this deal, which is in my thinking factually different from the Baskin-Robbins situation. Here you have a right being conveyed with future performance, but you seem to be focusing on expectation versus reliance. And I don't know where the rescission claim went. I don't know where the unjust enrichment claim went. So could you sort out what your theories are so we can figure out? Sure. You've zeroed in where the damages dispute lies in this case. You've zeroed in on the main issue of the appeal here. The theory of damages. I mean, right now, I think the main issue to decide is, is there. And the damages that we're seeking in the subject of this appeal are expectation damages. They are a producer's fee that they would have, that Areto would have gotten if they consummated a contract. They are lost profits as a component of that. There are certain benefits he would have gotten. Those are all calculated out by our experts, namely as quantified by Ed Cohen. But Kaplan and Bierstadt also do identify the lost damages as well. The lost producer's fee he would have received under the industry standards. So that is the main issue, is can he recover that type of damages. Now, there also is a reliance damage component, too. Mr. Areto had spent many years of his own personal time developing this concept as his job as a producer. And when they didn't first negotiate with him, he basically lost all that time. And there is a calculation by expert Ed Cohen that goes through and quantifies that damage. So for the purpose of this appeal, I think we ought to focus just on the expectation damages. Why do you want to do that? You've got Kaplan staring you in the face. You've got a California case that says expectation damages are too speculative.  I think that that's the issue. Is Copeland, does Copeland represent a per se rule that for any contract to negotiate a contract, does that mean you can never recover expectation damages? That was the question that the Ninth Circuit left open in Bestar, actually. Another case where they denied those damages, but I think on factual circumstances that are different here. There is the issue, too, and you're right, of receiving rescission of the contract. I think the main problem or the main distinction between Copeland and Bestar, and which was really problematical in this case, and problematical I think in all cases where you have this provision. This is a standard provision that's been used for decades. If this ruling stands, that provision I think is pretty much nullified because everyone's going to have this issue where most of their damages that they're trying to seek are the expectation damages. Why wouldn't you just want to get your rights back? Well, that's the other thing. Mr. Aratow transferred those rights. It might be better if you just let me finish. Okay. I'm sorry. I don't understand in the nature of the industry if this is a series of performances. One was the movie and the other was the follow-on with the TV production. Now, all Mr. Aratow got was the right of negotiation. But if the idea, at least as I understand your theory of the case, Columbia went ahead with the movie, but when it came to the TV production, and I know they dispute this, but the argument is, and perhaps the finding is, is that by the time they got around to negotiating or purporting to negotiate in this case, they'd already done a deal with someone else. Therefore, they could not perform or did not perform. So why doesn't Mr. Aratow then get his rights back? I think that was the next point I was going to make, and along those lines. He transferred a valuable right to them. This is the right to make a television show with the expectation that they would first negotiate with him. If his only remedy would be the expectation damages and the other damages which are denied here by the district court, then he essentially has given up something for nothing. So I think a final alternative remedy, what you're suggesting, what's pled in the complaint is to receive a rescission of the contract or a partial rescission and get those rights back. So that is another theory that could be pursued here. I do think that he is entitled to the expectation in the lines damages here. But alternatively, I think that he should be entitled to get them back or else he's given up something for nothing. And I think our expert Peter Bierstadt said that's not the expectation here, is that the television rights are thrown in free. He expects that any show that would be produced would come through him. It would have to come to him first if they want to involve Schwartz. I mean, Schwartz and Aratow got along. Schwartz wrote the letter saying, you know, I'd love to produce something with Aratow. That was a letter to Stephanie Drakovich who he was reporting to at the time. And I think something could have been worked out where Schwartz and Aratow produced it. You think that's the problem that Baskin-Robbins Copeland talks about is it's speculative. You think it could be, it could be. And the right of negotiation is not a right to conclude a deal. So I think isn't the tension here that we're all wrestling with, you're all wrestling with, is certainty, sufficient certainty to calculate damages. And Copeland says pretty much broad brush, certainly on the facts of that case, that expectation damages in an agreement to negotiate is too speculative. So you're trying to bring in ways to make it certain. But we're sitting in a diversity case. We're trying to figure out what the California courts have already suggested. You realize to distinguish this case somewhat on the fact that Aratow worked to promote this character over a period of years. That's correct. But that doesn't get him any place, even if there had been negotiations that did not result in some ongoing future contract to produce. Isn't that true? It would have been by the boards anyway. Right. But here there was an actual breach. They went and negotiated another contract. Well, I know, but had they negotiated and failed to reach an agreement, the efforts over the 15 years that you speak of would have been lost, if you will. True. Only if they didn't. That's true. They didn't breach the contract. So if they had if they had performed the contract from your vantage point by negotiating but failed to reach an agreement, all that effort would have been gone anyway. True. If they. OK. I would say that's true. And then you say that that Aratow received nothing out of this contract because they failed to negotiate. Isn't it true that they did other things for which he was paid substantial amounts of money over the years? Yeah. But that that the distinction is, is that he also gave them something right that he also expected a consideration for and he didn't get. But he while he did receive some sums of money, did he not? It was for the motion picture and that was for those rights. But as Mr. Bierstadt states in his declaration, the expectation is, is that you're you wouldn't give up television rights for free. So you're different. You're saying he got nothing for the television rights. That's right. Get something for the movie rights. Right. And for the period that he was promoting and trying to get the contract. I'm sorry, I didn't mean to interrupt. Well, now, if if you're going to pursue rescission. You don't have to make any repayment of any money that was received or tender any or offer any. Well, I think I think. No, because he gave services already for the motion picture. There's been an exchange of value there. And this part of it, I think it could be a partial rescission. It's just going to ask for the television rights back. So all you're saying is the best you're entitled to under a rescission theory is a partial. I think so. All right. If you were to get rescission, do you also get any compensation for the or does Columbia get any compensation for the for the rights that have already been exercised? And what happens when you rescind a contract? And that puts Mr. Arto back in the position of having all the TV rights. But in the meantime, Columbia has already has already, in fact, made some some TV shows on a contract that has now been rescinded. So what happens there? Well, I think that he then they don't have the rights to to to show those shows. I mean, that's that's the consequence. They couldn't they don't have the right spend of syndicating the program. And no, they would not because the television rights would go back. Now, they could negotiate with Arto to get them back if they wanted to package it up. But that was the consequence of their breach and their decision not to first negotiate with him and instead negotiate with Schwartz and cut him out of the deal completely. I mean, I think it's an unjust result right now as it stands with Arto having given up the TV rights and then being compensated nothing for them what he expected. So that's that's what's unsettling. And that's why Copeland and and Vestar, you had parties that essentially were made whole in Copeland. The three thousand dollar deposit was returned. The court recognized that there may have been some reliance damages and allowed them to recover. But at the end, they're made whole. They can walk away and they have some they're in the position they were as they were before the contract. We don't have that here. We have Arto who's worked all those years on promoting this and probably his promotion efforts causing this to finally come to fruition as a TV show. And then in the end, the TV show is made and he's not compensated at all for it. And I brought in as a producer, which really under the industry standards was a very minimal threshold to me. I think he would have met it based on the evidence that we presented here. Very quickly, could you you said start out by talking about the 1975 agreement? What what are the rights that were transferred by that? And what are you define them? And what are the rights that you were galaxy acquired thereafter? In other words, what wasn't transferred? Columbia seems to suggest that you essentially got everything. Mr. Arto got everything in 1975, plus the right of first refusal. If the next if anything else came from Mr. Scott and under that right of first refusal, which was assigned to Columbia under their theory. Even if you picked it up subsequent to 75, it came to them by way of that right of first refusal. I can sort of sort out where you what your theory is as to why there was anything left that Columbia didn't pick up under the 19 after the 1980 assignment after the 1975 contract. Sure. The 75 contract actually specifically references motion picture and television rights and then ancillary and subsidiary rights as a relationship between the terms used in the contract. So what Scott retained were other mediums in which the character could be used. You could retain the live stage rights, which Leon Kaplan had mentioned as one thing, and that's to maybe put on a Sheena production. There are other types of ways or mediums this character can be promoted. Now, Scott himself, when we go through the records of what he had assigned previously, he had made an assignment from the little holding company back to himself of all the rights. And then when he assigns everything to Arto, he carves up motion picture and television. So he recognizes when he's dealing with these rights that he's only giving a portion of the rights and he's retaining the rest, which means that he can do as he pleases with the rest. He can, with the exception of the one right that was carved out when they had to first present it to Columbia or actually not Columbia, but to Arto, that was the publication rights that he had retained. He could sell the other rights to whoever he pleased. In this case, he sold them to Galaxy. Once Galaxy assigns those rights to Columbia, what does it mean when the contract says that any rights that Arto gets in the future go to Columbia as well? What does that mean in 1980? Another key issue in the case. In 1980, I think it means whatever future rights he has then. And if you look through the contract, there's a right to indemnity and be held harmless. So if he's sued for any reason arising out of the transfer, I think that is a future right that arises out of the contract and he can then go to Scott and get indemnity. He has a right to assign the contract to someone else. That's a future right as well. There's a right to get an extension and pay some certain sum of money to extend the assignment. Those are future rights. And when the contract says he hereby assigns future rights, hereby is what he has then. There's nothing in the provision saying, and I think it should have been spelled out more. That's what Columbia meant it to mean because they drafted the contract. If you go out and acquire any of the rights that aren't part of these underlying agreements and what you're transferring to us now, then you need to turn those over to us or give us a… That was the right of first refusal I was puzzled by. Mr. Aretau had the right of first refusal should Mr. Scott decide to dispose of any of his retained rights. At least the assignment in 1980 from Aretau to Columbia seems to transfer all rights he had under that 75 agreement, which would presumably include the right of first refusal. So wouldn't that, wouldn't then if Mr. Scott comes along later and is prepared to sell off those retained rights, wouldn't Columbia by definition then have the right of first refusal in it? There are two points to address there. The first is I don't think in 1980 that Scott had the obligation to present to Aretau at that time the assignment, any other right he had. I think it was a very limited right. I can't recall the exact language, but I recall it was any new versions of the property. So if he did a new comic book on it or something where he did a new version, that was a limited right. The live stage rights were not part of this publication right that he was supposed to get first right of refusal on. The second point, though, I think is determinative here as well. And that was prior to Columbia obtaining its assignment, that option had already been extinguished because the option requires Scott when he wants to try to sell the rights, which he did at one point, these limited rights, to go to then whoever owns the assigned rights and offer it to them. And he did that. At the time, it was another studio, Universal, that owned the rights that had been transferred by Aretau. And he went to Universal, and Universal said, no, we don't want any of this little right that you want to sell to us. So at that point in time, that right is extinguished. So when all the contract rights get transferred then either from Universal to Columbia or Universal through Aretau to Columbia, it's a little unclear how it happened. That right did not pass because it did not exist. It had been extinguished because Scott had already made the offer to sell to Universal, and that was turned down. I think by its own terms, it extinguishes that right. So when that right did become available, Scott did have a right to sell it to Galaxy or whoever he wanted, and Galaxy had a right to purchase it. So I think that's how that issue plays out in facts. And it gets a little complicated with all these agreements. Well, now, all of the claims, other than the contract to negotiate, are all really determined by the scope of these various transfers, are they not? Well, they're determined to... Well, the only justification, for example, for having the website is the scope of the assignments. That will determine that, will it not? Only to a degree because there also is an integration clause in the producer's contract. So when you first had the...they'd executed all these agreements together, they had a producer's contract called a short-form contract, which had most of the major provisions. That was redrafted by Columbia later into a long-form contract, which contained an integration clause. So at that point in time, contracts go their separate ways. So if Areto breached, for some reason, the assignment contract by, you know, using the Sheena name or whatever he did, their remedy is to sue for breach of that contract. They can either get some kind of injunction to get him to stop, or if they were really damaged, and I don't think they were damaged here, but if they really were damaged, they could have sued him for damages. But, you know, I think with respect to all these arguments, they were all really made after the breach, trying to get out of it. And I think that that won't fall short because you have Columbia, which drafted the contract. I've got 59 seconds left. You're under the red. So finish up your answer. And I think that's my answer, is that you have an integrated agreement. A breach of one will not then nullify his rights under the producer's contract. All right. Thanks a lot. We'll give you a minute or so for rebuttal. Okay. Good morning, Your Honors. Gary Bostwick for Columbia. I'd like to go first to this. The contracts go their separate ways. I think our brief has enough in it to describe the fact that these were contracts that were negotiated and entered into at the same time, and one was part of the other, and the appellant, or appellee in this case, as it may be, has admitted in its briefing and has expressed itself over and over again that these two were in exchange for one another. So the fact that they now come forward and try to say that there's an integrated contract and a breach of one does not affect the other simply has to fall, I think, on deaf ears. Let's go to the part about what the future means. Our ears are never deaf. We may sort things out once we've heard them. I understand that. That was a poor choice of words, perhaps. But the fact is that it should not have any strength whatsoever, given the fact that they've said what they've said over and over again. Well, let's get to your point. I was struck by your fairly bold assertion in your brief that under a right of negotiation, that all that is conveyed by that is the opportunity to have a chat with Columbia, and if you don't spend any money preparing for that negotiation, you get nothing. So at the end of the process here, at least I may be misreading your brief, but I got the impression you were saying even if Columbia acted in bad faith and declined to honor its obligation under the contract to negotiate with Mr. Aretau, unless he had any kind of reliance damages, even though there's a breach, there's no remedy. I'm not trying to say that if they acted in bad faith, that would be the result. What would be the result, then, if they acted in bad faith? If they acted in bad faith, then I believe that they still, under Baskin-Robbins, if I understand the question correctly, under Baskin-Robbins, they still cannot receive expectation damages. What do they get? They get reliance damages, which is made up of … Reliance damages in the sense that they did nothing to prepare for the negotiation. They simply came in and they showed up so they may have $1,000 in attorney fees or whatever it costs to do that. That's the measure of damages. That's right. That is what I'm saying. For that, Columbia gets the television rights and gets all the rights to this Sheena character. Even if they don't ever, he gets nothing out of the production of the TV. In order to answer that, I think you have to go back to the very beginning. Mr. Errico got plenty from the very beginning. It was a television contract. What did he get? He got the right to produce. He got his workout fees paid off at the other studios. He produced the 1984 picture. That's for the movie. He transferred movie and TV rights. What did he get for the TV component of the assignment? He got paid at the end. If you look, he's been getting paid all along what he was supposed to get, which is right below paragraph 7 there. It says what he is supposed to receive. I'm not sure I've got it here. In terms of producer's services. At the bottom of paragraph seven, it says in the event Errico does not render such services, employers shall be entitled to receive the following. And the employer in that case is is wrap the personal services vehicle in this case. So all of all of that that is in subparagraph A and subparagraph B, excuse me, B, that never occurred because there was not a television motion picture, all of that in paragraph A. He's been getting paid all along. And Judge Levy asked a question earlier, I think, which I did want to make paper hot. He pardon me. He's been paid all along for the TV. Yes. For each episode of the television series based upon the picture or the work, he received the one thousand two hundred and fifty dollars for the 30 minutes and one thousand five hundred dollars for the 31 to 60 minutes. He's received that all along. That's never been an issue. And that is the fee for what? That's the fee in case there was a television series that was produced. And he was not the producer. OK. Now, if you go back to the television, I mean, the motion picture contract, this this that we're looking at here doesn't explain, though, what him. That still doesn't explain the still doesn't explain Columbia's conduct in not negotiating with Airtel first. We put in our brief something that I think is important here. In television, there are producers and executive producers. Mr. Airtel has claimed without any evidence to back it up that the the deal that's in paragraph seven was for him to be the executive producer or the excuse me, the key man producer. There's nothing anywhere in any evidence, any documents that says that.  His role in the movie was producer. And his and and the executive producer. No, he was the producer. Key man producer in movies. Generally, back in 1984, the producer was the person who was running everything. What was what was it in TV? In TV, the executive producer at the time, this television series was made. That's not the issue. The issue is when you just said that the time that this contract was made, what are the parties intend that he be when in terms of television production? What was the concept of producer in TV that was different from movies in 1980? Whenever this in 1980, when this contract was made back in 1980, there were executive producers and producers also in television. And in each case, it would depend upon what the contract said as to whether or not a person was an executive producer or a producer. And generally speaking, the executive producer was the key man producer. But there's never been any evidence that Mr. Erato had the right to insist upon being the key man producer. He's got. Well, there's no evidence that he had the right to insist on being any kind of a producer. He claims a right to negotiate and he claims in a right to negotiate to be a producer. Now, what you're telling us, that may mean that he had a right to negotiate to be any kind of a producer. Well, the word is the word in the in paragraph seven certainly is that they will negotiate with him first as a producer. All right. Any kind of a producer. Then maybe his right to negotiate is broader than it is as broad as anybody can make the word producer. But this does raise, I think, an important point here. Mr. Erato has shown no evidence that not negotiating with him before negotiating with Sears or Schwartz caused him any damages. Well, that's your reliance. That's your reliance issue. But that but are you conceding then that there was a breach of the contract? No. OK, well, because of the cross. You just argued damages. And I'm still trying to figure out whether Columbia had an obligation to go to Mr. Erato first before it began talking with Schwartz. No, it didn't. Why not? It didn't because he was not actively rendering services as a producer at that time, which is a disputed issue of fact. You're on summary judgment. Well, that's the point, though, for for the contract, whether or not there was a duty. The court below granted summary judgment, saying that Columbia did breach the contract. And there was a disputed issue of fact as to whether he was actively rendering services. And that's the strongest point for our argument that, in fact. Why did you negotiate with him at all then after once once he called and said, hey, how come you're talking to Schwartz? Well, I don't know the answer to that. But the evidence is that, in fact, he. Had some knowledge, abilities and so forth, and could perhaps be of help in the television program and the production. And and as you can see, they did negotiate for six months and they came very, very close. This is after Columbia. Right. That's not that doesn't make him first, does it? It doesn't make him first. I agree with that. That's a fact that that on Columbia's side, we have to face. They had agreements with both Schwartz and Sears before they negotiated with him. So unless you can prevail on the he wasn't qualified by terms of the contract, as Judge Levy was suggesting, producer does not rule out that he could have had the right to negotiate for any producer role that was open on that TV series. There is no evidence in the record and there's no law that's been argued one way or the other on that particular issue. Interpretation as producer. That's right. Some sub level. It does say as producer. And and they did negotiate with him for precisely that role. And they never negotiated with anyone else for anything other than executive producer. Now, I'm I'm simply saying that's what the evidence is. I want to go back to when Columbia back in 1980 is making the contract. They only that was a motion picture contract. Paragraph seven talks about what's going to be done if there's a television series or a television motion picture. But here's what Columbia was willing to do when it came to whether or not there was going to be a remake or a sequel on paragraph six. They're they're very clear. They say we're going to negotiate with you as producer. You're going to be the producer. However, when it comes to television, all they said is we will we will negotiate with you first. That's you say all. What does Columbia claim that acquired from Mr. Aratow in 1980? All of the rights that are in the assignment that every everything, including the future movies, television, publication, everything. Absolutely. OK, so for that, he gets a movie deal and he gets a contingency on television, which you say as well. That was in the apparently the generosity of Columbia. But Columbia is basically now saying he has given up everything. And for that, his remedy on the TV side of the deal is he gets the payouts. But he gets essentially zilch for the right to be a producer on it. Because the damages are so speculative. That may be in terms of expectation damages, but there is a principle in contract law about failure performance or other remedies for breach, which includes rescission. That's the one thing that is troublesome to me is that Columbia says we get to go ahead. Not only do we get to go ahead and make the TV series, but we also get to exploit the Sheena character in all media. We've got all of Mr. Aratow's rights in the Sheena character. And he has no damages because all he gets is reliance. Well, why isn't the concept of rescission alive in this case? With him being able to say, as we were talking earlier, fine, if you breach this contract, one of my remedies is to take back my rights and I'll go sell them someplace else. There is no specific cause of action or claim for relief for rescission. But that that cause that that cause of action was brought in state court and it was dismissed by the state court. Now, that's not before you at the moment. I'm simply telling you that that's part of the record that we could ask the court to take judicial notice of if it were of importance, that they brought in a rescission action in the state court and it was dismissed. But the point here, I think more than anything else, and that I'm concerned about is the misconception that that that Mr. Aratow didn't get anything. He had a film that was what is called in turnaround. There was a lot of money owed to a lot of studios and and Columbia paid that off in order to get his rights and then hired him in exchange to be the producer on the show. Here's my problem. Here's my problem. You're taking Baskin Robbins and saying it applies in the context of a two part deal on its face, a movie deal and a potential follow on TV deal. And you are saying Columbia's position says in that kind of construct, unless the sign or the Mr. Aratow's of the world can build up some kind of reliance damages, that promise to negotiate to be producer is valueless, valueless because you can walk away from it. Columbia can walk away from it. And I don't think that the California Court of Appeal had that fact scenario in mind when they wrote Baskin Robbins. It's a different kind of case. You've got, you know, here somebody has conveyed the entirety of a property right, which is to be developed by the sign of a sign. And yet you're saying we can at mid course of the play out of this potential deal, we can essentially walk away from one of the material elements of the contract. And under Baskin Robbins, too bad you get nothing except your reliance damages. And I just I have a lot of trouble thinking that this precedent in the entertainment industry makes any sense. Well, I'm not part of the California court system, so it's a little frustrating. What would you think about certifying this issue to the California Supreme Court? I think that it would be unnecessary because I believe Baskin Robbins is completely clear. And I understand that you think it's different, but I'm not sure it's clear on. Well, I think when you I think when you put it together with Vestar and and the general concept, I mean, Vestar says something very, very important. It says our state's counsel. One of the problems of writing opinions is you tend to get captured by the facts in front of you. And every one of us is. And you probably run up against it on the other side. This case doesn't make any sense when applied to our facts because you've spent your life distinguishing them. This appears to be one of those cases. I have no degree of confidence that either Vestar or Baskin Robbins anticipated this case. Maybe they did, but it's not evident on the face of the opinions. And when you said it in the original argument, I wrote it down and I said, that's something I need to deal with. And the point is that I think that there are differences. And the difference is this. There's an agreement that's been put together that something has been transferred. Baskin Robbins and Vestar. It was just an agreement to do something. It was a promise. This deal was put together for consideration. And one of them was that right to write a first negotiation to produce. And that has got to be a lot more valuable than the scheduled payouts under 7A and B. It's possible, although the show was not successful. It didn't go anywhere. I'm sure that wasn't Columbia's intention, was it? No, it wasn't. Not at all. And it wasn't Columbia's intention not to negotiate with him at all. So we come in, obviously, always after the facts. And the point is, you cannot change what has already happened. But the difference, the only difference between Baskin Robbins and here is that he, in fact, received a good deal of value. He received a chance to be a producer of a movie when he had never produced a movie before. I think that's irrelevant. The issue is, what did he get for his TV rights and the value of everything else that you claim he assigned? The movie was a part of the deal. Nobody's arguing he didn't. Columbia got what it bargained for, and he got what he bargained for. The issue in this case, as posed by your own argument, is that we had an obligation to negotiate. Even if we didn't live up to that, there's no remedy, no effective remedy. There's no remedy in this particular case, and there could have been in two or three other instances, no question about it. I mean, if he had prepared a production tape, for instance, for purposes of the negotiation, if he had turned it down, another project. He gave away, counsel, by your own claim, he gave away all of his rights to this character. Not just movie, but TV, publication, anything. And you're saying for that, he got his movie payout. That's it. He got his. It was 7A under for the TV, and that's it. Yeah, and it does not seem. That Columbia gets protection against and disables him from anything else. No, it doesn't disable him. It disables him from getting anything that is purely speculative. What compensation does he get for the exploit, Columbia's exploitation of the subsidiary and ancillary rights related to the TV production, or to comic books, or whatever else it now decides it owns under this assignment? But that was the benefit. What compensation does he get? He doesn't get anything other than what he got, which is what happened in 1980. He didn't get everything he bargained for. He got what he bargained for in 1980, except for paragraph 7. He didn't get his right to negotiate. He didn't get his right to negotiate first. Well. That's what he didn't get. Right. And the point about that I think that is important. If you look at the negotiations that took place and you see how close the parties were, you cannot say that he didn't get negotiated with. He didn't get negotiated with first, and there's been no connection, no causal connection in any way at all in the court below, in this record, about how he was damaged by what happened here when they made contracts with Schwartz and Sears first. Okay. Now, this is an interim appeal. Both of these are interim appeals. That's right. Now, I have the impression that a whole lot of claims were dismissed without prejudice and some waiver of the statute of limitations. So the only thing that is really interim about this appeal is the damages issue on the breach of contract, is it not? No. I think also our appeal of the finding that Columbia breached the contract is also very important and could take care of the whole thing. So there's only those two issues that are interim? The trademark and cyber piracy issues are also interim. But they're final judgments, are they not? No, because there's no damages that have been found yet. There's been no proof put on about the damages. So even though there was a finding of violation, there was no evidence taken on the subject of damages as a result of the cyber piracy. So all of those are. Now, I want to direct your attention to 44 of the red brief in case number 218, because I'm having trouble comprehending what you're saying. You argue there that the registration of this name by the defendant constituted a dilution, right? That's right. Then when you get to the footnote on the next page, you say Columbia's cancellation action may be dismissed without prejudice as neither the defendants have completed any trademark registration. Now, what does all that mean? What that means is that there was a violation of the trademark. In terms of trademark dilution, there was a violation. But because there has been no registration, the cause of action for cancellation of Mr. But you argue that the registration is the dilution. No, no. The registration of the domain name was the dilution. OK. And there was no registration. It turns out, and we found out, there was no registration of the trademark by Mr. So cancellation is moved. Now, that means we have to partially reverse that judgment, do we not? Because the Court granted you relief there. We can't just dismiss it. We start with a partial reversal, true? On only the cancellation action. That would be true. All right. OK. Thank you, Your Honors. All right. You have one minute because we've got a question for the next Counsel. All right. That's wise counsel who doesn't over-argue. Bless the Court, Your Honor. Thank you both. It's a very interesting case. The case just argued is submitted, and we'll stand at recess. I'll rise. This Court stands at a recent time. My clock.
judges: Leavy, Fisher, Bybee